**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Brian W. and Melissa W., individually and on behalf of A.W., | : : : | |
| Plaintiffs, | : : | Civil Action No. |
| v. | : : | |
| Methacton School District, | : : | |
| Defendant. | : | |

## COMPLAINT

### PRELIMINARY STATEMENT

1.     This action is brought under the Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act of 1973 (Section 504), and Title II of the Americans with Disabilities Act (ADA).

2.     Plaintiffs Brian W. and Melissa W. (Parents) bring this action individually and on behalf of their child, A.W., who is a student with disabilities in the Methacton School District.

3.     Parents filed a special-education due process complaint against the District on May 28, 2025, and they amended their complaint on July 28, 2025.

4.     Parents filed the complaint because the District failed to provide A.W. with a free and appropriate public education (FAPE) and denied her equal access to the District's programming.

5.     Because the District denied A.W. the special-education services she needs, A.W. did not make educational progress.

6.     Rather than sit idly by while A.W. languished, Parents privately funded hundreds

1

of hours of special-education instructional services that the District should have provided her—intensive Orton-Gillingham and Wilson Reading System tutoring and private speech-and-language therapy.

7.    But even with hundreds of hours of privately funded instruction, A.W. still struggled because she was not receiving the appropriate supports in school. Although she is a child with average intelligence, A.W. remains a nonreader in third grade, is far behind her peers in nearly all areas of reading, and is unable to access instruction that involves grade-level content.

8.    During the due process proceedings, Parents requested changes to A.W.'s educational program, compensatory education, and reimbursement for an independent educational evaluation.

9.    On March 25, 2026, a hearing officer issued a decision finding, in part, against Parents. *See* H.O. Dec., attached as Ex. A.

10.    Parents bring this action to challenge the hearing officer's decision and vindicate A.W.'s rights under the IDEA, Section 504, and the ADA.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and under the IDEA, Section 504, and the ADA.

12.    Venue is proper under 28 U.S.C. § 1391(b).

13.    Parents have fully exhausted their administrative remedies.

## PARTIES

14.    Parents Brian W. and Melissa W. are the plaintiffs and A.W.'s parents.

15.    A.W. is a student with triple-deficit dyslexia, Attention Deficit Hyperactivity Disorder (ADHD), and speech-and-language impairments.

16. By reason of her disabilities, A.W. requires special-education services.

17. A.W. is "disabled" under Section 504 and the ADA.

18. A.W. is otherwise qualified to participate in school activities under Section 504 and the ADA.

19. The District is a local educational agency (LEA) under the IDEA, and at all relevant times to this complaint, the District was A.W.'s LEA.

20. The District receives federal funding.

## STATUTORY AND REGULATORY BACKGROUND

21. Congress enacted the IDEA to "ensur[e] children with disabilities and the families of such children [have] access to a free appropriate public education and [to] improv[e] educational results for children with disabilities." 20 U.S.C. § 1400(c)(3).

22. The IDEA and its implementing regulations, 34 C.F.R. Part 300, *et seq.*, require states and LEAs that receive IDEA funds to provide children with disabilities FAPE.

23. A child is eligible for services under the IDEA if she has a disability and "by reason thereof, needs special education and related services." 34 C.F.R. § 300.8(a).

24. Section 504 likewise requires children with disabilities to receive FAPE, but it protects more children, affording protection to any child who has an impairment that substantially limits a major life activity but who is otherwise qualified to participate in school activities.

25. Section 504 prohibits the exclusion of, or discrimination against, any otherwise qualified individual with a disability by recipients of federal funds. Failure to provide necessary accommodations and supplemental services is discrimination under Section 504.

26. The ADA extends the nondiscrimination rule of Section 504 to services provided by any "public entity" without regard to whether the entity is a recipient of federal funds.

3

27. The IDEA, Section 504, and the ADA require LEAs to appropriately evaluate children with disabilities.

28. When a parent establishes that an LEA failed to appropriately evaluate her child, the parent is entitled to an independent educational evaluation (IEE) at public expense. 34 C.F.R. § 300.502(b). The LEA must consider the IEE when programming for the student. *Id.* § 300.502(c)(1).

29. The IDEA also requires states and LEAs to develop an Individualized Education Program (IEP) for qualifying children with disabilities. 20 U.S.C. § 1412(a)(4).

30. Each IEP must contain a statement of the student's present levels of academic achievement, measurable annual goals, a description of how the student's progress towards those goals will be measured, and a list of accommodations, supplementary aids and services, and modifications needed to help the student achieve her goals and be educated in the least restrictive environment. 20 U.S.C. § 1414(d)(1)(A)(i).

31. The LEA's IEP team is supposed to review and offer a new IEP annually. 20 U.S.C. § 1414(d)(4)(A).

32. IEPs must provide services and supports that are reasonably calculated to afford children FAPE. *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 390–91 (2017). The IEP is the centerpiece for the child's education. *Id*.

33. Under Section 504 and the ADA, children with disabilities must receive service plans that provide them FAPE. "Schools are required to provide education and services that 'are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met.'" *A.C. v. Owen J. Roberts Sch. Dist.*, 554 F. Supp. 3d 620, 623 (E.D. Pa. 2021) (quoting 34 C.F.R. § 104.33). That means, under Section 504 and the ADA,

4

schools "must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement" as nonhandicapped persons. 34 C.F.R. § 104.33(b)(2).

34.     If an LEA fails to properly identify, evaluate, place, or provide FAPE to a child, her parents may request a due process hearing.

35.     If the child's parents establish a denial of FAPE or discrimination under the IDEA, Section 504, or the ADA, they may be entitled to various remedies, including compensatory education. *See Sch. Dist. of Phila. v. Post*, 262 F. Supp. 3d 178, 197 (E.D. Pa. 2017).

36.     Compensatory education is an equitable award, which can be used for tutoring, speech and language services, educational summer programs, and other services that remedy a FAPE denial or denial of equal educational opportunity.

37.     Other remedies available to parents includes reimbursement for IEEs.

38.     If parents are aggrieved by a hearing officer's decision, they can challenge the decision in this Court. 20 U.S.C. § 1415(i)(2).

39.     Prevailing parents may recoup their statutory attorney's fees and costs under the IDEA, Section 504, and the ADA.

## STATEMENT OF FACTS

40.     A.W. is a child with academic potential.

41.     She has average intelligence.

42.     She works very hard and wants to do well in school.

43.     A.W. has triple-deficit dyslexia, ADHD, and speech-and-language impairments.

44.     Triple-deficit dyslexia is the most severe type of dyslexia.

45.     Children with triple-deficit dyslexia exhibit orthographic deficits (difficulty

recognizing familiar words), phonological deficits (difficulty associating sounds with letters or groups of letters), and naming deficits (difficulty retrieving the names of familiar visual symbols, such as letters).

46.   A.W.'s phonological short-term memory and auditory memory are impaired, which makes decoding (reading) and encoding (spelling) difficult and compromises her ability to retain information and skills.

47.   A.W.'s speech-and-language impairments impede her ability to process auditory and visual information, understand language, and communicate.

48.   A.W.'s ADHD causes her to struggle with attention and focus, particularly in large classroom environments.

49.   As a result of her disabilities, A.W. has challenges with listening comprehension, decoding and encoding, reading comprehension, word finding, analyzing and understanding words, expressing herself in a sequentially sensical way, and retaining and generalizing new skills and information.

50.   These challenges affect A.W.'s ability to read, write, perform math, express herself, and follow and understand classroom directions and curriculum-based instruction.

51.   In July 2022, before A.W. started kindergarten, Parents provided the District with (i) a private evaluation from Dr. Alexis Rosenfeld recommending that A.W. receive an IEP for Other Health Impairment (OHI) (for ADHD), speech and language impairment (SLI), and a specific learning disability (SLD) in reading and written expression when she entered kindergarten; and (ii) a speech and language report by Ms. Karen Clapper, corroborating Dr. Rosenfeld's conclusions.

52.   During the summer of 2022, Parents also hired a private Orton-Gillingham (OG)

tutor and two private speech and language therapists to work with A.W.

53.     OG is a highly structured, systematic, and sequential phonics-based reading program designed to help children with reading deficits.

54.     OG is a form of specially designed instruction.

55.     Throughout the summer of 2022, A.W. met with her OG tutor two hours per week and with each speech therapist once a week for an hour.

56.     At the start of kindergarten, the District issued an evaluation of A.W. that included no new cognitive, achievement, or social-emotional testing, which are standard in IDEA evaluations.

57.     Instead, the District adopted Dr. Rosenfeld's IQ, achievement, and social-emotional testing.

58.     Despite deferring to Dr. Rosenfeld's testing, the District ignored her conclusion that A.W. has a specific learning disability in reading.

59.     The District identified A.W. as eligible for an IEP only under OHI (for ADHD) and SLI.

60.     The District developed an IEP for A.W., which addressed only A.W.'s ADHD and speech-and-language impairment, but not her reading needs.

61.     The IEP had no reading goals, which A.W. needed.

62.     The IEP had no specially designed instruction (SDI), which A.W. needed for reading or literacy.

63.     The IEP had no direct, specialized, or small-group instruction for reading or literacy, which A.W. needed.

64.     Because the District refused to provide A.W. any special-education services for

reading, Parents continued paying for OG tutoring, twice a week, for all of kindergarten.

65.    At home during kindergarten, Parents worked with A.W. extensively each night on reading, high-frequency words, and spelling.

66.    Throughout kindergarten, Parents expressed concern to the District that A.W. was not receiving appropriate supports to address her reading needs.

67.    In February 2023, the IEP team held a meeting. Parents' educational experts—including Dr. Rosenfeld, Ms. Clapper, an educational consultant, and A.W.'s OG tutor—attended and expressed serious concern about A.W.'s reading.

68.    At that meeting, Parents again urged the District to provide A.W. special-education services for reading, including goals in the areas of phonological awareness, decoding, encoding, and listening comprehension; SDIs; and specialized instruction.

69.    The District refused because A.W. was not identified with a specific learning disability and because she was performing "at benchmark" on her benchmark assessments and "proficiently" in the kindergarten curriculum.

70.    Benchmark assessments are tests administered periodically to students—often at the beginning, middle, and end of the school year—designed to track progress over time and gauge whether a student is on track to meet end-of-year goals.

71.    The District, however, did not consider the impact of A.W.'s private OG tutoring or speech-and-language services on her benchmark testing or classroom performance.

72.    In April 2023, the District conducted a reevaluation but again performed no new cognitive, achievement, or social-emotional testing. The District relied only on a review of records, teacher input, and classroom observations.

73.    The District updated A.W.'s IEP but still did not identify her as having a specific

8

learning disability or address her reading needs.

74.    The updated IEP lacked any goals, SDIs, or other special-education services targeting reading or literacy.

75.    Despite A.W.'s identification as OHI for ADHD, the IEP also had no goals in the areas of attention or focus.

76.    The SDIs in the IEP were minimal and generic.

77.    The District did not offer A.W. extended school year (ESY) services for the summer of 2023 (the summer before first grade).

78.    Parents therefore continued A.W.'s private tutoring—which had switched to the Wilson Reading Program—twice a week throughout that summer.

79.    The Wilson Reading Program is a highly structured, systematic, and sequential phonics-based reading program designed to help children with reading deficits.

80.    Wilson instruction is a form of specially designed instruction.

81.    Wilson instruction is typically provided through an IEP.

82.    During first grade, A.W.'s struggles intensified.

83.    At home every evening, Parents worked with A.W. on reading and decoding, studied high-frequency words with her for 30 to 45 minutes, and practiced spelling for another 30 to 45 minutes.

84.    A.W. continued to receive twice-a-week private Wilson tutoring and once-a-week speech therapy throughout all of first grade.

85.    Despite Parents' intensive efforts and A.W.'s private tutoring, A.W.'s benchmark scores declined over the course of first grade.

86.    Although A.W. began first grade mostly on benchmark, she finished well below

benchmark across all areas of reading, and some scores even regressed during the year.

87. A.W.'s report cards, conference reports, and unit assessments showed that she was not meeting grade-level expectations and demonstrated "limited progress" towards grade-level English Language Arts (ELA) standards, even with read-aloud accommodations in place.

88. A.W. also lacked important math skills expected of first graders, and she struggled significantly with attention and focus throughout first grade. Her first-grade teacher described A.W.'s attention struggles as "atypical."

89. Parents told the District, at every opportunity, that they were concerned about A.W.'s reading.

90. The District updated A.W.'s IEP in February 2024. That IEP still did not address A.W.'s reading needs, lacked goals in reading, and had no goals in the areas of attention or focus.

91. The District again did not offer A.W. ESY for the summer of 2024. Parents continued A.W.'s private Wilson tutoring twice a week throughout the summer.

92. Due to A.W.'s poor benchmark scores at the end of first grade, Parents requested an IEP meeting before second grade started, a comprehensive evaluation, and immediate changes to A.W.'s program to address her reading needs.

93. The District agreed to reevaluate A.W. but again refused to immediately address her reading needs, insisting that an SLD classification was necessary before it could include reading-based services in her IEP.

94. From the beginning of second grade (the 2024-2025 school year) through November 14, 2024, A.W.'s IEP remained materially unchanged from her first-grade IEP, still offering zero special-education supports in reading.

95. On October 15, 2024—more than two years after Parents first provided the District

Dr. Rosenfeld's evaluation diagnosing A.W. with dyslexia—the District issued a reevaluation report which included its own testing.

96. That report finally identified A.W. with an SLD in basic reading, reading fluency, and reading comprehension, and reaffirmed her SLI and OHI identifications.

97. As part of the reevaluation, the District administered the WISC-V. A.W.'s full-scale IQ measured at 84—an 18-point drop from her IQ just three years prior.

98. The District did not administer a nonverbal IQ test, even after receiving these results and despite knowing of A.W.'s longstanding speech-and-language impairments, which can artificially depress scores on traditional cognitive measures.

99. Nor did the reevaluation include a Central Auditory Processing Disorder (CAPD) assessment or a SETT evaluation (an evaluation that examines whether a child needs assistive technology), despite recommendations from Ms. Clapper and Dr. Rosenfeld to conduct both.

100. The reevaluation's recommendations were generic, overly broad, and insufficient to meet A.W.'s literacy, speech-and-language, working memory, executive functioning, writing, and math needs.

101. After the reevaluation, the District updated A.W.'s IEP in November 2024. But the IEP still did not adequately address A.W.'s reading needs.

102. The IEP offered just 20 minutes per day of direct instruction in the special education ELA classroom.

103. The IEP kept A.W. in the general education ELA class for 100 minutes per day, even though A.W. could not access instruction in that setting because of her reading, language, and attention deficits.

104. The IEP's oral reading fluency goal was not sufficiently ambitious.

11

105. The IEP's decoding goal was also inappropriate because it did not measure whether A.W. was generalizing her reading skills.

106. The IEP lacked goals in other demonstrated areas of need, including reading comprehension and attention and focus.

107. The IEP lacked any goals or SDIs targeting A.W.'s needs in writing or math.

108. The District also failed to implement the IEP. Although the IEP required one-on-one Wilson instruction for 45 minutes per day, five days per week, Wilson sessions were frequently cancelled due to instructor absence.

109. Because Parents had concerns about the District's reevaluation and the appropriateness of A.W.'s IEP, they paid for Dr. Rosenfeld to conduct an independent reevaluation of A.W.

110. Dr. Rosenfeld determined that, in addition to her reading deficits, A.W. was below average in writing fluency, below average in spelling, and was beginning to fall behind in math.

111. As part of her reevaluation, Dr. Rosenfeld administered the CTONI-2, a nonverbal cognitive assessment. On that assessment, A.W.'s IQ score was 102—solidly average and consistent with her IQ score before she entered kindergarten.

112. Dr. Rosenfeld also observed A.W. at school, in both her regular education and special education ELA classes. She found that A.W. was unable to access the general education curriculum or instruction due to her reading, language, and attention deficits.

113. Dr. Rosenfeld recommended, among other things: 45 minutes per day of direct instruction in reading fluency and comprehension; 45 minutes per day of Wilson instruction; reading support across all academic areas, including assistive technology; and SDIs targeting writing and math.

114.    Despite the initiation of some special-education reading services in second grade, A.W. remained well below benchmark in all areas of reading—including decoding, fluency, accuracy, and comprehension—throughout all of second grade.

115.    A.W. made very limited progress—and even regressed at some points—across all aspects of literacy during second grade, coming nowhere close to meeting her benchmark goals.

116.    A.W. also struggled with spelling in second grade. Each night, Parents spent 30 to 45 minutes practicing and studying spelling words with her. Even with that preparation, A.W. had difficulty spelling words that were not on a studied list.

117.    A.W.'s classroom teachers reported that attention and focus remained significant areas of weakness throughout second grade. In a District classroom observation, A.W. was observed to be off task 47% of the time, which impacted her ability to follow or understand instruction.

118.    According to A.W.'s teachers, she was frozen in class, often confused, and needed constant redirection.

119.    In third grade (the 2025-2026 school year), A.W. remained a nonreader.

120.    A.W.'s third-grade IEP increased her time in the special education ELA classroom from 20 to 30 minutes per day—still far less than what A.W. needed—and was deficient in the same ways as her second-grade IEPs. The third-grade IEP had insufficient direct instruction time, no reading comprehension goal, no attention or focus goals, and inadequate SDIs throughout the school day.

121.    The District did not even implement all the direct instruction that A.W.'s IEP required. A.W.'s third-grade regular education teacher reported that A.W. attended the special education ELA class for only 20 to 25 minutes each day, and A.W. received direct instruction from

13

a special education teacher in that class only every other day.

122. The District continued to cancel Wilson sessions in third grade due to instructor absence.

123. The District also failed to implement other portions of A.W.'s IEP. For example, the IEP required that Parents receive monthly progress updates on A.W.'s phonics-based reading intervention and oral reading fluency, but the District never provided the updates to Parents.

124. As a result of all these deficiencies, A.W. made no meaningful progress in third grade and even regressed in some areas, including reading comprehension.

125. A.W. also fell behind her peers in math.

126. Despite receiving hundreds of hours of private instruction paid for by Parents, A.W. has made no meaningful academic progress since she started at the District.

127. The gap between A.W. and her peers has widened during her years at the District.

128. Parents filed a special-education due process complaint against the District on May 28, 2025, under the IDEA, Section 504, and the ADA. On July 28, 2025, Parents amended their due process complaint.

129. In the amended complaint, Parents alleged that the District denied A.W. FAPE from May 28, 2023 through the present.

130. After an administrative trial, a special-education hearing officer issued a decision on March 25, 2026. *See* H.O. Dec., attached as Ex. A.

131. The hearing officer found a denial of FAPE under the IDEA and Section 504 during portions of second grade, awarded Parents relief for the denial, and awarded them relief for the District's failure to implement Wilson instruction in second and third grade. The hearing officer awarded (1) 50 hours of compensatory literacy instruction targeting decoding, encoding, reading

14

fluency, and reading comprehension, (2) 20 hours of compensatory education targeting executive functioning and academic access skills, and (3) compensatory Wilson Reading System instruction equal to the net amount of sessions not delivered during second and third grade.

132.    The hearing officer, however, denied the rest of Parents' claims.

133.    Parents bring this action to challenge the hearing officer's decision and vindicate A.W.'s rights under the IDEA, Section 504, and the ADA.

**COUNT I**
**COMPENSATORY EDUCATION UNDER THE IDEA, SECTION 504, AND THE ADA**

134.    Parents incorporate paragraphs 1 through 133 as if fully set forth.

135.    The hearing officer erred by finding no denial of FAPE during the 2022-2023, 2023-2024, and 2025-2026 school years.

136.    The hearing officer erred by finding a denial of FAPE for only portions of the 2024-2025 school year.

137.    Even if the hearing officer was right that the District denied A.W. FAPE for only portions of the 2024-2025 school year, the hearing officer erred by awarding only 70 hours of compensatory education for the denial.

138.    The District denied A.W. FAPE from May 28, 2023, through the present by failing to provide A.W. IEPs that appropriately address her significant needs in reading, speech-and-language, attention, executive functioning, writing, and math.

139.    The District failed to implement the IEPs it did offer.

140.    The District's denial of FAPE caused A.W. not to make meaningful progress across reading, writing, math, attention and focus, and speech and language.

141.    The District failed to afford A.W. equal opportunity to benefit from its program.

15

142. The District denied A.W. reasonable accommodations and modifications to its program.

143. A.W. is entitled to full-day compensatory education for each school day between May 28, 2023, and the present, including for ESY.

144. Parents request full days of compensatory education for that period, with the compensatory education placed in a special needs trust for A.W.

## COUNT II
### INDEPENDENT EDUCATIONAL EVALUATION UNDER THE IDEA, SECTION 504, AND THE ADA

145. Parents incorporate paragraphs 1 through 144 as if fully set forth.

146. The hearing officer erred by denying reimbursement for A.W.'s independent educational evaluation.

147. The District's October 2024 reevaluation of A.W. was deficient and failed to adequately assess A.W. in all areas of need.

148. Among other things, the October 2024 reevaluation failed to administer a nonverbal cognitive assessment, despite A.W.'s longstanding speech-and-language impairments, which are known to artificially depress scores on traditional cognitive measures.

149. The reevaluation also failed to conduct a Central Auditory Processing Disorder (CAPD) assessment or a SETT evaluation, despite recommendations from multiple educational experts.

150. Parents are entitled to funding and reimbursement for the independent educational evaluation conducted by Dr. Rosenfeld because the District failed to properly evaluate A.W.

## COUNT III
### PROSPECTIVE RELIEF UNDER THE IDEA, SECTION 504, AND THE ADA

151.    Parents incorporate paragraphs 1 through 150 as if fully set forth.

152.    The District has failed to provide A.W. an IEP that appropriately addresses her needs in reading, speech-and-language, attention, executive functioning, writing, and math.

153.    Evaluators who assessed A.W.—including Dr. Alexis Rosenfeld, Ms. Karen Clapper, and Ms. Kate Mayer—have made specific recommendations to address A.W.'s educational needs, including that the District provide her more time in a special education ELA classroom each school day.

154.    The District has failed to implement those recommendations.

155.    A.W. is entitled to prospective injunctive relief under the IDEA, Section 504, and the ADA requiring the District to revise A.W.'s IEP to incorporate the recommendations of Dr. Rosenfeld, Ms. Clapper, and Ms. Mayer, and offer A.W. an IEP which provides her with FAPE.

## COUNT IV
### ATTORNEY'S FEES AND COSTS UNDER THE IDEA, SECTION 504, AND THE ADA

156.    Parents incorporate paragraphs 1 through 155 as if fully set forth.

157.    Parents prevailed at the due process hearing under the IDEA and Section 504.

158.    The hearing officer determined that the District denied A.W. FAPE under the IDEA and Section 504.

159.    The hearing officer determined that Parents' ADA claims were outside her jurisdiction, but the hearing officer's conclusion that the District denied A.W. FAPE makes Parents a prevailing party under the ADA.

160.    Parents obtained important and significant relief.

161.    The special-education hearing officer found that the District denied A.W. FAPE during the 2024-2025 school year and ordered the District to provide A.W. with 50 hours of compensatory literacy instruction, 20 hours of compensatory education targeting executive functioning and academic access skills, and compensatory Wilson Reading System instruction equal to the net amount of sessions not delivered.

162.    As the prevailing party, Parents are entitled to reasonable attorney's fees and costs under 20 U.S.C. § 1415(i)(3)(B), 29 U.S.C. § 794a, and 42 U.S.C. § 12205 for the due process hearing and this action.

**WHEREFORE**, Parents respectfully request that this Court:

1.    Order compensatory education for each school day between May 28, 2023, and the present, including for ESY, with compensatory education placed in a special needs trust.

2.    Award Parents an independent educational evaluation.

3.    Order the District to convene an IEP meeting and provide A.W. an appropriate IEP.

4.    Award Parents their reasonable attorney's fees and costs.

5.    Correct any erroneous factual findings made by the Hearing Officer.

6.    Grant any other relief that this Court deems appropriate.

Respectfully submitted,


_____
LINDSAY BURRILL-VANDELLEN, ESQUIRE
KEVIN A. GOLEMBIEWSKI, ESQUIRE
Berney & Sang
8 Penn Center
1628 JFK Boulevard, Ste. 1000
Philadelphia, PA 19103
laburrillvandellen@berneylaw.com
kag@berneylaw.com
215-564-1030 (office)
215-751-9739 (fax)
Attorneys for Parents

Dated:  June 15, 2026

# Exhibit A

# **Pennsylvania Special Education Hearing Officer**

## **Final Decision and Order**

### **Closed Hearing**

### **ODR File Number:**

### **Child's Name:**

A███████  W███████

### **Date of Birth:**

███████

### **Parent:**

M/M B████  and M█████  W██████

████████████████

████████████████

*Counsel for Parent*

Lindsay Burrill-VanDellen, Esq.
1628 JFK Blvd., Suite 1000
Philadelphia, PA 19103

### **Local Education Agency:**

Methacton School District
1001 Kriebel Mill Road
Eagleville PA 19043

*Counsel for LEA.*

Mark Burgmann, Esq.
Wisler Pearlstine, LLP
460 Norristown Rd., Ste 110
Blue Bell, PA 19422-2323

### **Hearing Officer:**

Joy Waters Fleming, Esq.

### **Date of Decision:**

March 25, 2026

# <u>INFORMATION AND PROCEDURAL HISTORY</u>

The Student[1] is a ten-year-old child currently enrolled in the third grade at a District elementary school and eligible for special education and related services as a child with a specific learning disability, a speech and language impairment, and as other health impaired based on attention-deficit/hyperactivity disorder (ADHD). On May 28, 2025, the Parents filed a Due Process Complaint against the District under the IDEA[2], Section 504[3], and the Americans with Disabilities Act (ADA)[4], contending that the District denied Student a free, appropriate public education and seeks relief consistent with that claim. The District contends that no FAPE denial occurred and no relief is due.

With leave of the Hearing Officer, the Parents filed an amended complaint on July 28, 2025. The additional allegations arose from the same conduct, transactions, and occurrences set forth in the original filing. Although the filing of the amended complaint restarted certain procedural timelines, it did not alter the operative filing date for statute-of-limitations

---

[1] In the interest of confidentiality and privacy, Student's name, gender, and other potentially identifiable information are not used in the body of this decision. All personally identifiable information, including details appearing on the cover page of this decision, will be redacted prior to its posting on the website of the Office for Dispute Resolution in compliance with its obligation to make special education hearing officer decisions available to the public pursuant to 20 U.S.C. § 1415(h)(4)(A) and 34 C.F.R. § 300.513(d)(2).

[2] 20 U.S.C. §§ 1400-1482. The federal regulations implementing the IDEA are codified in 34 C.F.R. §§ 300.1 – 300. 818. The applicable Pennsylvania regulations are set forth in 22 Pa. Code §§ 14.101 – 14.163 (Chapter 14).

[3] 29 U.S.C. § 794. The federal regulations implementing Section 504 are codified in 34 C.F.R. §§ 104.1 – 104.61; the applicable Pennsylvania regulations are set forth in 22 Pa. Code §§ 15.1 – 15.11 (Chapter 15).

[4] 42 U.S.C. §§ 12101 – 12213.

purposes. Accordingly, claims arising on or after May 28, 2023, were deemed timely under the IDEA's two-year limitations period.

This matter proceeded through multiple prehearing motions and procedural rulings. Written orders issued during the pendency of the case were marked as Hearing Officer exhibits and are incorporated into the record. The due process hearing occurred over numerous sessions spanning several months.[5] Although the parties initially framed the issues as encompassing the period from May 28, 2023, through the conclusion of the 2024-2025 school year, the evidentiary record developed extensively regarding Student's educational programming during the 2025-2026 school year. Both parties addressed the adequacy of programming during that school year in testimony and post-hearing submissions. To avoid duplicative proceedings involving the same student and related claims, this decision addresses the adequacy of the District's programming through the date of the final January hearing session.

For the reasons set forth below, the Parents' claims are granted in part and denied in part.

## <u>ISSUES</u>

1) Did the District deny the Student a FAPE from May 28, 2023, until the end of the 2024-2025 school year under the IDEA, Section 504 or the ADA by:

---

[5] The decision due date (DDD) was extended only after a request from the parties.

    a.  Performing an inadequate special education evaluation in October 2024?

    b.  Failing to develop and implement appropriate IEPs calculated to allow for meaningful educational progress?

2)    Are the Parents' claims before July 28, 2023, barred by the statute of limitations?

3)    If the District denied the Student a FAPE, is an IEE and/or compensatory education or other remedy appropriate?

## **FINDINGS OF FACTS**

1. The Student is an elementary school student eligible for special education as a child with a specific learning disability (SLD), a speech and language impairment (SLI), and as other health impaired (OHI) based on attention-deficit/hyperactivity disorder (ADHD). (P-45)

2. The Student is regarded as happy, kind, positive, social, hardworking, and conscientious. (P-45, p. 30; N.T. 345-348, 692, 784-789, 980-981)

## **Before kindergarten**

3. An evaluation and subsequent reevaluation conducted before kindergarten determined that the Student did not meet the criteria for a developmental delay and did not require early intervention services. (P-2, P-15, p. 2)

4. In June 2021, a private Speech-Language Pathologist (SLP) evaluated the Student after the Parents expressed concerns about challenges with word-finding and dyslexia. Although the Student was in the average range, the SLP provided focused therapy. The following year, the private SLP diagnosed the Student with a language processing disorder, a specific language impairment, and a language-based learning disability (P-5, p. 2-7)

5. In March and November 2022, an assessment of early literacy skills indicated that the Student was at risk of developing difficulties with word reading and phonological awareness, including dyslexia. The evaluator became the family's educational/literacy consultant. (P-8, P-9, P-10, P-141; N.T. 212, 143, 169, 1198-1200, 1206, 1290-1304, 1344-1346)

6. In July 2022, a private certified school psychologist concluded that the Student had challenges with language processing/auditory memory, phonological and orthographic processing, rapid naming, and executive functioning. The evaluator determined that the Student should be eligible for special education as a child with a speech and language impairment (SLI), a specific learning disability (SLD)(dyslexia), and other health impairment (OHI)(ADHD). (P-2)

7. The summer before kindergarten, the Parents expressed concerns to the District regarding the Student's reading, speech, and social-emotional functioning. The Parents provided the District with the private evaluations and advised that the Student received private reading tutoring and Speech services. The Parents consented to a District evaluation of the Student. (P-2, P-5, P-11, P-12, P-15, p. 2, P-

28, p. 12, P-38, p.13, P-108, p.11,18, S-13, p. 102; N.T. 188-189, 212, 242-243)

## 2022-2023 Kindergarten

8. During the 2022-2023 school year, the Student attended full-day kindergarten in the District. (N.T. 180)

9. During kindergarten, the Student received reading tutoring and speech therapy funded by the Parents. (P-38, P-108, p.11,18, P-109, p. 6; S-13, p. 102; N.T. 188-189, 212, 242-243)

## October 2022 District Reevaluation

10. The District issued its evaluation report in October 2022, which relied in substantial part on the private psychoeducational evaluation for cognitive, achievement, and social-emotional data. The District's RR also included summaries of the privately obtained literacy screening, OT and speech data,  parental and teacher input, and updated testing speech-language assessments.  (P-15)

11. For inclusion in the ER, a District SLP administered assessments, including the LPT-3 and LCT-2, and conducted an observation of the Student. (P-15, p. 15)

12. The RR determined the Student needed specially designed instruction on the basis of a speech or language impairment (SLI) (primary) and a secondary disability of other health impairment (OHI) (ADHD). Because the Student was performing proficiently in the

kindergarten curriculum, the RR did not adopt the private evaluator's SLD eligibility determination. (P-15, p. 24; N.T. 1103, 1120-1122)

## December 2022 IEP

13.    In December 2022, the IEP team met to develop programming. The offered programming included three speech goals (answering questions, word identification, following directions), compatible SDI, and thirty minutes of weekly speech therapy.   (P-16, P-18, S-82; N.T. 765)

14.    In February 2023, the District held a team meeting to address the Parents' concerns about the Student's reading abilities. In addition to the Parent, the family's educational consultant, private educational psychologist, speech therapist, and tutor attended the meeting. Following the meeting, the Parents consented to a reevaluation of the Student. (P-22, S-6, S-13, p. 37)

## April 2023 District Reevaluation

15.    On April 28, 2023, the District issued its reevaluation report (RR) of the Student. The April RR included a records review of prior private and District evaluations, updated teacher input, observation, and data from previously conducted informal and formal speech-language assessments.   (P-25, S-4, p. 6-9; N.T. 766, 1123)

16.    The RR concluded the Student was academically proficient in reading decoding, reading comprehension, written expression and math; and meeting expectations in science and social studies.

Although speech assessments did not determine a word-finding disorder, the RR recommended that those skills be addressed informally to address parental concerns. (S-4, p. 18; N.T. 768)

17. The RR identified a need in listening comprehension and concluded the Student had a disability and needed specially designed instruction based on speech-language impairment (SLI) (primary) and other health impairment (OHI) (ADHD) (secondary). (P-25, p. 17)

## May 2023 IEP

18. On May 24, 2023, the team met to revise the Student's IEP, including updated skills, informal goals, and a baseline for word finding.

19. The May IEP included a speech goal to address unknown-word identification and thirty minutes of weekly individual speech therapy. SDI included gaining eye contact, chunking, verbal repetition, wait time, P4 (pause, picture, plan, produce), and verbal cues. Although the Parents expressed concerns that the District's literacy programming did not address the Student's risk factors for dyslexia, they approved the team's recommendation for itinerant-level speech-language support. ( P-28, S-7)

## 2023-2024-First Grade

20. During the 2023-2024 school year, the Student was enrolled in first grade in the District and initially received special education programming through the May 2023 IEP. (S-6; N.T. 285, 335)

21.     Early in the school year, the Parents advised the first-grade teacher of the Student's diagnoses and of privately supplied speech therapy and reading tutoring. (S-31, p. 53, S-79; N.T. 89, 296-297, 335, 351)

22.     Following October benchmark reading assessments, the Student received pull-out, small-group, Tier II, multi-tiered systems of support (MTSS) reading instruction from a District reading specialist. (P-76, S-26, N.T. 287-288, 336-337)

23.     During Tier II support, a level 1 Wilson-certified District reading specialist provided the Student with thirty minutes of small-group, daily instruction.     (S-85; N.T. 579-580, 610-611

24.     On October 5, 2023, the Parent contacted the classroom teacher with concerns regarding sight-word struggles, the Student's placement in Tier II reading, a dyslexia diagnosis, and advised of a change from Orton-Gillingham to Wilson tutoring. The Parents requested that the District provide Wilson reading instruction. (P-109, S-31, p. 53; N.T. 296)

25.     Based on mid-year benchmark testing, the District moved the Student from Tier II to Tier I reading support. Although the Student's i-Ready score declined, performance measures through the DIBELS and F & P indicated progress. (P-76, S-26)

## February 2024 IEP

26.     On February 26, 2024, the District held an annual IEP meeting. (P-31, S-16, pp. 7-8, 19-24)

27.     Present levels indicated the Student accessed regular education for all subject areas and was progressing toward expectations in reading decoding, reading comprehension, math, and meeting expectations in science and social studies. (P-31, p. 6)

28.     Parents' concerns included the MTSS reading support and speech/communication issues at home. Teacher input indicated that the Student used age-appropriate vocabulary, grammar, and sentence structure; responded correctly to comprehension questions (oral and written); shared ideas in an organized and coherent manner; and remembered orally presented information. Teacher concerns included emerging narrative writing skills and sometimes omitted story elements. (P-31, p. 6, S-16; N.T. 371)

29.     The Student's progress on speech-language goals was discussed; one goal was mastered. The February IEP offered three speech goals to address (two-step directions, answering WH questions, sequential task explanation).   SDI included eye contact, chunking, oral repetition, wait time, and verbal cues. Offered related services included thirty minutes of individual speech therapy per cycle. (P-31, p. 25-26, S-16, p. 23; N.T. 775)

30.     The February 2024 IEP continued itinerant speech-language support, direct individual speech-language therapy, consultative services, and monitoring of word-finding concerns. The team determined the Student ineligible for ESY. (S-16)

31.     In March 2024, the District moved the Student back to Tier II reading support. However, by the end of first grade, reading data indicated the need for Tier III support. (S-74; N.T. 298, 359-361, 581)

32.     During first grade, in addition to tiered reading support, the Student received 1.5 hours of reading instruction, 50 minutes of writing instruction, and 50 minutes of math instruction. Sight words were reviewed daily in school, and assessments for understanding were administered monthly. All delivered curriculum aligned with the Pennsylvania State standards (P-105, S-6, p. 42, S-16, p. 25-26, S-26, S-39, S-69, S-79; N.T. 349, 335-339, 341, 368, 373-374)

33.     In first grade, the Student received final grades of P (progressing toward expectations) or M (met expectations). (P-70; N.T. 312-318)

**First Grade Progress**

34.     At the beginning (September), middle (January) and end (May) of first grade, the Student received benchmark testing. (P-76, P-77, S-39, p. 4, S-59, p. 13, S-74; N.T. 641, 643)

35.     In reading, according to the F & P, during first grade, the Student progressed from level D (end of kindergarten) to G (middle of first grade), but by the end of the school year, fell to H (February of first grade). On the DIBELS, at the beginning of first grade, the Student received a below benchmark score of (102), and by the middle of the year, the score rose to above benchmark (145). By the end of first grade, the Student's level fell below the benchmark to the intensive range (99). (P-76, P-77, S-39, p. 4; N.T. 601)

36.     In reading, on the iReady, at the beginning of first grade, the Student performed at the 61st percentile (below grade level). By the middle of the year, the Students' performance declined to the 31st percentile (below grade level). By the end of first grade, the Student performed at the 51st percentile (early first grade level). (P-76, S-25, S-26, S-39, p. 4; N.T. 322. 358, 363, 599, 620, 643)

37.      According to iReady math assessments, the Student progressed from the 56th percentile (below grade level) to the 70th percentile (mid or above grade level. On Linkit testing, the Student performed in the fourth quartile (81.1%) but moved to the third quartile (89.2-97.2%) by the end of first grade.   (S-39, p. 5)

38.     In speech, the Student demonstrated emerging expressive language skills with partial progress in comprehension and narrative language. Speech therapy services ended on May 26, 2023, and informal word-finding goals were not introduced. Overall, The Student demonstrated limited but measurable progress in vocabulary identification and basic comprehension, with continued needs in higher-level language skills and direction-following. (P-61, P-97)

## Summer 2024

39.     On August 14, 2024, an informal meeting was held with the Parents, their education/literacy advocate, and District staff. Following the meeting, the Parents requested that the Student receive intensive, one-on-one, structured literacy instruction with compatible strategies. (P-35, P-38, p. 6, 12)

40.     On August 23, 2024, after the Parent requested a reevaluation, the District issued a NOREP that proposed a records review, cognitive and academic achievement testing, socio-emotional/behavioral rating scales, speech/language and occupational therapy evaluations, Parent/teacher input, and observations. Although the Parents consented, they requested "more psychometrically sound diagnostic assessments" and expressed "significant concerns about [Student's]extensive history of intervention". (S-33; N.T. 1126-1128)

## 2024-2025 School Year–Second Grade

41.     During the 2024-2025 school year, the Student was enrolled in the second grade in the District. (P-45; N.T. 689)

## August 2024-IEP

42.     On August 29, 2024, the IEP team met to clarify programming and evaluation parameters. The Parents requested the administration of a specific assessment (TILLS). (P-38, S-34, S-35; N.T. 623, 1132-1137, 1144-1147)

43.     Following the meeting, the Parents requested a NOREP reflecting their previous request for a structured literacy intervention, the administration of the TILLS, and an evidence-aligned analysis of the Student's response to intervention. (P-38, S-34, p. 6, 11-12, S-73, p. 106)

44.    The NOREP issued by the District rejected daily individualized literacy as too restrictive, and the TILLS assessment due to concerns regarding administration, scoring, norm-referencing, and standardization, but invited the Parents and their advocate to suggest alternate specific assessments. (P-38)

45.    At the end of September, the District's reading specialist administered placement testing to the Student. S-38; S-85; N.T. 535-536; 606-608, N.T. 624-625)

46.    After testing, the Student received thirty minutes of daily Tier III (intensive reading intervention) with two other children. The reading specialist provided instruction using a research-based, multi-level program that focused on phonemic awareness, phonics, and blending. Progress monitoring occurred every two weeks. Administered benchmark testing did not necessitate math intervention. (P-45, p. 5, S-38, S-40; N.T. 581-582, 624, 627, 692)

## October 2024 RR

47.    On October 15, 2024, the District issued its RR concerning the Student. The RR included Parent and teacher input, assessments of cognitive, language, academic, and social-emotional, speech and OT functioning, classroom observations, and a summary of previous assessments. (P-45, S-39; N.T. 1148-1150, 1154-1155)

48.    The assessments were administered by experienced, credentialed professionals who used valid, reliable measures

administered in accordance with testing directions. (S-39, S-87; N.T. 1151)

49.     On the WISC-V, the Student's overall intellectual functioning was within the low-average range, with a general ability index in the 23rd percentile. (P-45, S-39; N.T. 1159-1161)

50.     Academic testing administered through the WIAT-4 indicated low-average basic reading skills, very low reading fluency, low-average reading comprehension, average math, low written expression, average listening comprehension, and low-average oral expression. (P-45, p. 12-13, S-39; N.T. 1165-1166)

51.     Reading assessments reported in the RR indicated some levels well below benchmark and grade level. (P-45, p. 4)

52.     The Student's math benchmark testing indicated performance between basic and proficient (44%-53.9%). On the i-Ready, the Student performed at the 57th percentile, one grade level below. (P-45, p. 4)

53.     Parent input referenced the Student's diagnosis of dyslexia, reading struggles and language disorders. Teacher input indicated that the Student was kind and wanted to do well, proficient in reading consonant-short-vowel-consonant patterns, trying to sound out words, having difficulty remembering details, and needing redirection. (P-45, p. 3, 6)

54.     On teacher completed  BASC-3 rating scales, the Student's ratings fell within the at-risk range for learning problems and leadership. The Parents' rating indicated the Student was in the at-risk range for

symptoms of atypicality, attention problems, leadership, and functional communication. (P-45, p. 15)

55.    On the BRIEF-2, the Parents' ratings of the Student for inhibit, shift, initiate, working memory, planning and task monitoring fell within the clinically significant range. According to the teacher rating, the areas of shift and working memory fell within the clinically significant range. (P-45, p. 16)

56.    For inclusion in the RR, the District's SLP conducted hours of speech assessments that included (TAPS-4, CELF-5, CASL-2, TNL-2, LCT-2, LPT3), a language sample, and a classroom observation. (S-39, p. 16-26; N.T. 766-768)

57.    After testing, the SLP concluded the Student presented with fluency, voice, articulation, receptive and pragmatic language and listening comprehension within normal limits. (S-39, p. 26)

58.    The Student's performance on the CELF-5 and the CASL-2 revealed clinically significant differences in the receptive and expressive indices. The SLP concluded the Student's ADHD more than likely impacted expressive language skills (P-45)

59.    Although the Student's scores were within the range of average, the SLP concluded that continued parental concerns regarding expressive language skills, along with clinically significant differences, indicated the Student would benefit from continued speech therapy to strengthen receptive and expressive language skills. The SLP recommended a continuation of speech therapy for thirty minutes per

cycle with word-finding in discourse and informal monitoring. (S-39, p. 26; N.T. 777-778)

60. Assessments by a licensed occupational therapist of fine motor control, sensory processing, and fine motor skills indicated that the Student did not require intervention. (P-45, p. 26-29)

61. The RR concluded the Student exhibited a severe discrepancy between ability (nonverbal cognitive skills) and achievement in reading and was eligible and in need of special education services based upon a specific learning disability (SLD) in basic reading, reading fluency, reading comprehension, a Speech or Language Impairment (SLI) (expressive language) and OHI (ADHD). (P-45; N.T. 777, 1152-1153)

62. The October 2024 reevaluation identified the Student's needs in reading accuracy/phonics, reading fluency, reading comprehension, spelling, attention/focus/working memory, and expressive language, and made recommendations for the IEP team. (S-39, p. 30-32, S-43, p. 6-10)

## November 2024 IEP

63. In November 2024, the Student was assessed through the WIST. The Students' reading scores, except for spelling, were at or below the 1st percentile. (P-86; N.T. 585)

64. On November 14, 2024, the IEP team met to develop programming. The IEP offered supplemental learning support and

speech-language support, multiple measurable annual goals, SDIs and accommodations, 45 minutes of daily intensive, research-based, specialized direct phonics/ reading instruction, 20 minutes daily of special education reading /spelling instruction, and 30 minutes of group and 30 minutes of individual speech-language therapy per cycle. (S-43, p. 18-28, 32-33)

65.     The Wilson Reading System, a research-based program, was selected as the Student's specialized program.  (P-48, p. 3, 6, S-42, S-43, S-44; N.T. 447, 631-633)

66.     The November IEP included two reading goals (decoding/ encoding), (oral reading fluency), and three speech goals (expressive vocabulary, grammar, inference). The IEP speech goals were developed collaboratively with the private SLP. (P-48, p. 20-22; N.T. 779-783)

67.     SDI included chunking, oral repetition, verbal cues, preferential seating, monthly phonics progress updates to the parents, notification of changes to the student grouping in the specialized reading program, and testing accommodations. (P-48, S-43; N.T. 455, 464-467)

68.     After specialized reading instruction began, the District replaced the original teacher for the Student with a Wilson-certified instructor. District staff, including the reading specialist, Wilson instructor, and case manager, collected data and provided Parents with progress updates through a shared Google spreadsheet and through formal IEP

progress reports.[6] (P-101, S-58, S-73, p. 66, 78, 92; N.T. 584, 591, 635)

## January 2025 IEP revision

69.     On January 24, 2025, following a meeting between the District and a private SLP, the District revised the Student's IEP, including updated speech-language goals and baseline data. The Parents did not return the NOREP.  (S-46, p. 1, 7, S-47, S-73)

70.     On February 17, 2025, the Parents advised they would place the Student in a private school and seek tuition reimbursement from the District. (P-54, p. 13)

## February 2025 IEP Revision

71.     On February 25, 2025, the Student's IEP team met to address the Student's progress and the Parents' tuition reimbursement request. Expressed Parent concerns included sufficiency of Wilson instruction, data compilation, appropriateness of the second-grade reading program, and ESY. (P-53, P-54, P-130, p. 17, S-50, S-51, S-52; N.T. 475, 638)

72.     At the meeting, the District offered ESY, added an additional oral reading fluency goal, scheduled a follow-up meeting, but declined to fund a private placement. (P-54, p. 7-8, 10, 14, 40, S-55)

---

[6] Although the District created a live Google document with continuous updating of data of the students' decoding and encoding probes, the Parents were unable to access it. (S-58; N.T. 504)

## March 2025 IEP Revision

73.    On March 19, 2025, the IEP team updated the Student's IEP without a meeting in response to additional input from the Parents. The revision added concerns from the reading specialist about the impact of private Wilson reading instruction on the Student's progress. The Parents indicated that ESY may be beneficial, but it would not give the Student a break from school. (P-56, p. 7, P-110, p. 27, N.T. 478, 486, 518, 638-639, 1005)

74.    On June 23, 2025, through a NOREP, the District removed speech and reading services from the offered ESY and proposed only Wilson instruction. The Parents did not return the NOREP but communicated that summer tutoring plans were already confirmed. (P-60, P-110, p. 41, S-55, S-73, p. 1-2; N.T. 154-155)

75.    During second grade, the Student received daily small-group instruction in English Language Arts and Math. Although daily, individual Wilson instruction was slated to occur, some sessions were cancelled, then rescheduled for make-up. At the end of the school year, the District owed the Student 135 minutes of instruction. (P-48, P-56, P-137, p.2; N.T. 102-103, 690-692)

76.    During speech therapy, the SLP used word webs, visuals on a smartboard, tactile cues, inferencing charts, and verb lists. Visual aids such as word webs, inference charts, and lists of irregular past-tense verbs were used to support therapy. Strategies such as "P4" (Pause, Picture, Plan, Produce) and "Stay With It" were implemented to help the Student process and produce information (S-66, S-67, S-68, S-69; N.T. 785-787, 790-791).

## Second Grade Progress

77.    According to a WADE assessment, from November to June of second grade, the Student progressed in correct responses in sounds from 53% to 65%, in reading from 13% to 28%, and in spelling from 9% to 23%. (P-99)

78.    From December 2024 until June 2025 of the 2024-2025 school year, although still below benchmark, the Student made progress and met or exceeded the decoding, encoding and fluency goals.   (P-68, S-58)

79.    From February 2025 until June 2025, in second grade, the Student made progress in oral reading fluency (ORF), consistently improving WCPM and maintaining high accuracy.  (P-68, S-58)

80.    According to the DIBELS benchmark, the Student received a score of 311. By the middle of the year, the Students' scores rose to 362, and by the end of the year, it reached 407. (P-76, P-77)

81.    In speech, the Student occasionally struggled to focus and attend but made some progress in expressive vocabulary, grammar and inferencing skills with increased accuracy and independence across the school year. (P-68, P-97)

82.    On July 28, 2025, the Parents filed an amended due process complaint.

## 2025-2026 School Year -Third Grade

83.    During the 2025-2026 school year, the Student attended third grade in the District. (P-130)

84.    At the start of third grade, benchmark data indicated Student's regression in foundational reading skills, including decreases in nonsense word fluency, oral reading rate, and overall reading placement level. (S-74, S-76)

85.    In September 2025, Parents provided the District with a private psychoeducational evaluation identifying dyslexia and recommending substantially increased and specialized literacy intervention. (P-3)

## November IEP

86.    In November, the District convened an IEP meeting to review the private evaluation and update programming. (P-130, S-91)

87.    The District proposed and conducted a reevaluation, including a functional behavioral assessment, with parental consent. (S-91)

88.    The November 2025 IEP offered extensive SDI to address reading, writing, speaking and executive functioning needs including forty-five minutes of daily intensive research-based phonics reading instruction and thirty minutes of daily direct reading instruction in fluency, comprehension, and spelling patterns. Thirty minutes of group and thirty minutes of individual speech therapy were also offered per cycle.  (P-130)

89.     The November IEP included updated reading goals (including oral reading fluency), speech-language goals, extensive accommodations, and eligibility for ESY services based on a history of regression. (P-130)

90.     The Student received approximately 120 minutes of daily ELA instruction, primarily focused on decoding skills, and approximately 45 minutes per day of Wilson reading instruction. (P-137, p.2)

91.     During third grade, some Wilson reading sessions were missed. As of December 2025, the District owed the Student 285 minutes of instruction. The District offered to extend certain sessions, to make up the missed time.  (P-137, p. 2)

92.     The District issued its reevaluation report in January 2026. At the time of the hearing, the IEP team was actively planning a meeting to review the reevaluation and develop a revised IEP. (N.T. 967)

# DISCUSSION AND APPLICATION OF LAW

## General Legal Principles

### The Burden of Proof

The burden of proof consists of two elements: the burden of production and persuasion. In special education due process hearings, the burden of persuasion lies with the party seeking relief. *Schaffer v. Weast*, 546 U.S. 49,

62 (2005); *L.E. v. Ramsey Board of Education*, 435 F.3d 384, 392 (3d Cir. 2006). The party seeking relief must prove entitlement to their demand by preponderant evidence and cannot prevail if the evidence rests in equipoise. *See N.M., ex rel. M.M. v. The School Dist. of Philadelphia*, 394 Fed.Appx. 920, 922 (3rd Cir. 2010), *citing Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004).

In this case, the Parents are the party seeking relief and bear the burden of proof.

## **Witness Credibility**

During a due process hearing, the hearing officer is charged with judging the credibility of witnesses and must make "express, qualitative determinations regarding the relative credibility and persuasiveness of the witnesses." *Blount v. Lancaster-Lebanon Intermediate Unit*, 2003 LEXIS 21639 at *28 (2003). One purpose of an explicit credibility determination is to give courts the information that they need in the event of judicial review. *See, D.K. v. Abington School District*, 696 F.3d 233, 243 (3d Cir. 2014) ("[Courts] must accept the state agency's credibility determinations unless the non-testimonial extrinsic evidence in the record would justify a contrary conclusion."). *See also, generally David G. v. Council Rock School District*, 2009 WL 3064732 (E.D. Pa. 2009); *T.E. v. Cumberland Valley School District*, 2014 U.S. Dist. LEXIS 1471 *11-12 (M.D. Pa. 2014); A.*S. v. Office for Dispute Resolution (Quakertown Community School District)*, 88 A.3d 256, 266 (Pa. Commw. 2014); *Rylan M. v. Dover Area Sch. Dist.*, No. 1:16-CV-1260, 2017 U.S. Dist. LEXIS 70265 (M.D. Pa. May 9, 2017).

In addition to the Parent, regular and special education teachers, for kindergarten, first, second, and third grades, reading specialists, a District SLP, a special education administrator, and a school psychologist, the Parents presented testimony from three expert witnesses. The District called no witnesses. Greater weight was assigned to testimony grounded in direct instructional involvement, contemporaneous data, and demonstrated responsiveness to Student's changing educational needs. These credibility determinations inform the findings that the District's programming was generally appropriate during certain periods but partially insufficient during others.

The testimony from District staff was afforded substantial weight. These witnesses demonstrated direct involvement in Student's programming, familiarity with benchmark data and progress monitoring, and knowledge of instructional services delivered. Their testimony was largely consistent with contemporaneous educational records and reflected ongoing efforts to adjust programming in response to evolving performance data. Where minor inconsistencies arose, they were attributable to the passage of time or to differences in interpretation rather than to attempts to minimize Student's needs. Importantly, District witnesses acknowledged areas of difficulty, including regression, the need for increased instructional intensity, missed instructional sessions and record production challenges. Their candor enhanced credibility.

The Student's mother testified at length regarding her observations of Student's academic functioning, communication with the District, and efforts to secure private supports. Her testimony was generally credible, candid, consistent with the documentary record, and reflective of a parent actively engaged in her child's education. She was credible with respect to descriptions of Student's struggles, her understanding of District

communications, and her concerns regarding progress. Although her observations were afforded meaningful weight, her conclusions regarding the legal adequacy of the District's programming were considered alongside objective performance data and other testimony.

The Parents also presented testimony from a licensed clinical psychologist and certified school psychologist who conducted private psychoeducational evaluations of Student. This witness was properly qualified as an expert in school psychology and clinical psychology. Her testimony was detailed, grounded in standardized assessment results, and generally consistent with the documentary record concerning Student's cognitive profile, attention-related needs, and emerging reading disability. The psychologist's opinions are afforded significant weight with respect to the identification of the Student's disability profile and the severity of her reading difficulties. Her evaluations provided useful insight into phonological processing weaknesses, working memory concerns, and the need for intensive literacy intervention.

The testimony of the private speech-language pathologist is afforded moderate weight. The witness demonstrated extensive professional experience and longstanding familiarity with Student's language profile. Her opinions are credited regarding the presence of expressive language vulnerabilities and the need for continued intervention. However, the weight of her conclusions regarding the alleged inadequacy of District programming was reduced. The witness did not observe Student in the educational setting, could not produce all records, and relied in part on qualitative impressions and personal clinical experience rather than standardized comparative measures. Accordingly, her testimony was considered informative but not controlling in determining whether the District's services met the IDEA standard.

The Parents called their advocate, an educational/literacy consultant, as a witness and offered her as an expert in evidence-based reading instruction, curriculum development, and literacy assessment and intervention. After consideration of her qualifications, testimony, and the totality of the record, the undersigned affords limited weight to her opinions. Although the witness has experience in literacy advocacy and has participated in educational consulting activities, the record reflects that she has not taught in public schools in recent years and has not worked within the Pennsylvania public school system. Although she obtained very recent credentials after she screened the Student, she lacks formal training or certification in special education, school psychology, or educational measurement. Notwithstanding these limitations, the witness offered opinions regarding the legal adequacy of the District's programming under the IDEA and the psychometric soundness of certain standardized assessments. These opinions exceed the scope of her demonstrated expertise and are therefore afforded diminished persuasive value. In addition, the witness acknowledged that she is not certified in specific structured literacy programs used by the District and that she did not observe Student in the classroom or in District-provided interventions. Moreover, her direct interaction with Student was limited.

## **General IDEA Principles: Substantive FAPE**

The IDEA requires each of the states to provide a "free appropriate public education" (FAPE) to children who are eligible for special education services. 20 U.S.C. § 1412. FAPE consists of both special education and related services. 20 U.S.C. § 1401(9); 34 C.F.R. § 300.17. The United States Supreme Court has developed a two-part test for determining whether a school district has provided a free appropriate public education (hereafter

sometimes referred to as "FAPE") to a student with a disability. There must be: (1) a determination as to whether a school district has complied with the procedural safeguards as set forth in IDEA, and (2) an analysis of whether the individualized educational program is reasonably calculated to enable the child to make progress in light of the child's unique circumstances. *Endrew F by Joseph F v. Douglass County School District RE- 1*, 580 U.S. \_\_\_, 137 S. Ct. 988, 69 IDELR 174 (2017); *Board of Educ., etc. v. Rowley*, 458 U.S. 178, 553 IDELR 656 (1982); *KD by Theresa Dunn and Jonathan Dunn v. Downingtown Area School District*, 904 F.3d 248, 72 IDELR 261 (3d Cir. 2018)

Individualization is, accordingly, the fundamental consideration for purposes of the IDEA. Nevertheless, an LEA is not obligated to "provide 'the optimal level of services,' or incorporate every program requested by the child's parents." *Ridley School District v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012). Additionally, a proper assessment of whether a proposed IEP meets the above standard must be based on information "as of the time it was made." *D.S. v. Bayonne Board of Education*, 602 F.3d 553, 564-65 (3d Cir. 2010); *see also Fuhrmann v. East Hanover Board of Education*, 993 F.2d 1031, 1040 (3d Cir. 1993)(same). "The IEP must aim to enable the child to make progress." *Dunn v. Downingtown Area School District*, 904 F.3d 248, 255 (3d Cir. 2018)(emphasis in original). IEP development, of course, must follow and be based on an evaluation, as monitored and updated by interim changes. 20 U.S.C. § 1414(d); 34 C.F.R. §§ 300.320-300.324.

**Evaluation Requirements**

Substantively, the IDEA sets forth two purposes of a special education evaluation: to determine whether or not a child is a child with a disability as

defined in the law, and to "determine the educational needs of such child[.]" 20 U.S.C. §1414(a)(1)(C)(i). Certain procedural requirements are set forth in the IDEA and its implementing regulations that are designed to ensure that all of the child's individual needs are appropriately examined. 20 U.S.C. § 1414(b)(2); *see also* 34 C.F.R. §§ 300.303(a), 304(b). The evaluation must assess the child "in all areas related to the suspected disability[.]" 34 C.F.R. § 304(c)(4); *see also* 20 U.S.C. § 1414(b)(3)(B). Additionally, the evaluation must be "sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified," and utilize "[a]ssessment tools and strategies that provide relevant information that directly assists persons in determining the educational needs of the child[.]" 34 C.F.R. §§ 304(c)(6) and (c)(7); *see also* 20 U.S.C. § 1414(b)(3).

If parents disagree with an LEA's educational evaluation, they may request an IEE at public expense. 20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.502(b). Parents are entitled to an IEE funded by the LEA if the evaluation does not meet IDEA criteria.

## General IDEA Principles: Procedural  FAPE

From a procedural standpoint, the family plays "a significant role in the IEP process." *Schaffer*, *supra*, at 53. This critical concept extends to placement decisions. 20 U.S.C. § 1414(e); 34 C.F.R. §§ 300.116(b), 300.501(b); *see also Letter to Veazey*, 37 IDELR 10 OSEP 2001 (confirming the position of OSEP that LEAs cannot unilaterally make placement decisions about eligible children to the exclusion of their parents). Consistent with these principles, a denial of a FAPE may be found if there has been a

significant impediment to meaningful decision-making by parents. 20 U.S.C. § 1415(f)(3)(E); 34 C.F.R. § 300.513(a)(2).

Full participation in the IEP process does not mean, however, that LEAs must defer to parents' wishes. *See, e.g., Blackmon v. Springfield R-XII School District*, 198 F.3d 648, 657-58 (8th Cir.1999)(noting that IDEA "does not require school districts simply to accede to parents' demands without considering any suitable alternatives," and that failure to agree on placement does not constitute a procedural violation of the IDEA).

### General Section 504 and ADA Principles

Section 504 of the Rehabilitation Act of 1973 prohibits discrimination based on a handicap or disability. 29 U.S.C. § 794. A person has a handicap if he or she "has a physical or mental impairment which substantially limits one or more major life activities," or has a record of such impairment or is regarded as having such impairment. 34 C.F.R. § 104.3(j)(1). "Major life activities" include learning. 34 C.F.R. § 104.3(j)(2)(ii).

The obligation to provide FAPE is substantively the same under Section 504 and the IDEA. *Ridgewood v. Board of Education*, 172 F.3d 238, 253 (3d Cir. 1995). Further, the substantive standards for evaluating claims under Section 504 and the ADA are essentially identical. See, e.g., *Ridley School District. v. M.R.*, 680 F.3d 260, 282-283 (3d Cir. 2012). Courts have long recognized the similarity between claims made under those two statutes, particularly when considered together with claims under the IDEA. See, e.g., *Swope v. Central York School District*, 796 F. Supp. 2d 592 (M.D. Pa. 2011); *Taylor v. Altoona Area School District*, 737 F. Supp. 2d 474 (W.D. Pa. 2010); *Derrick F. v. Red Lion Area School District*, 586 F. Supp. 2d 282 (M.D. Pa. 2008). Thus, in this case, the coextensive Section 504 and ADA claims that

challenge the obligation to provide FAPE on the same grounds as the issues under the IDEA will be addressed together.

## **Parents' Claims**

The Parents contend that the District denied the Student a free appropriate public education (FAPE) beginning in May 2023 and continuing across multiple school years by implementing IEPs that failed to address established needs, providing insufficient speech-language services, omitting necessary specially designed instruction (SDI), and improperly denying extended school year (ESY) services. The Parents also challenge the sufficiency and timing of the District's October 2024 reevaluation of the Student.

This record established that the District had early notice of Student's vulnerability to reading difficulties, including privately obtained evaluations identifying risk factors associated with dyslexia, phonological processing deficits, auditory memory weaknesses, and executive functioning concerns. The Parents consistently communicated their concerns and provided documentation of privately funded tutoring and speech-language services. These facts required the District to remain vigilant in monitoring Student's literacy development and to adjust programming in response to emerging data.

The IDEA does not require a school district to adopt a private evaluator's diagnostic conclusions or recommended methodologies, nor does it obligate a district to provide the most intensive conceivable intervention in the absence of performance data demonstrating the necessity for such programming. However, eligibility and program design decisions must be evaluated considering the information reasonably available to the IEP team at that time.

During kindergarten and spring 2023, the District conducted evaluations and reevaluations that incorporated private reports, teacher observations, updated speech-language testing, and classroom performance data. These evaluations consistently identified speech-language impairment as the primary disability and OHI (ADHD) as secondary, while concluding that the Student was performing proficiently within the kindergarten curriculum and did not meet criteria for a specific learning disability at that time. Although the presence of dyslexia risk factors warranted continued monitoring and instructional responsiveness, the record does not demonstrate that the data available during this period compelled immediate SLD identification or intensive specialized reading instruction within the IEP. Additionally, available data did not warrant ESY for the summer after kindergarten.

The May 2023 IEP appropriately focused on the needs identified through District evaluation, including listening comprehension and expressive language skills, and provided speech-language goals, SDIs targeting processing and attentional functioning, and direct therapy services. On this hearing record, the May 2023 programming was reasonably calculated to enable Student to make appropriate progress in light of then demonstrated levels of performance. The Parents have not met their burden that a FAPE denial occurred from May 2023 through the summer of the 2022-2023 school year.

At the outset of first grade, Student's benchmark reading data reflected variability rather than a clear pattern of regression or stagnation. Some measures fell below the benchmark, while others indicated performance within the early first-grade range. The District responded by providing Tier II MTSS intervention consisting of daily small-group instruction delivered by a Wilson-trained reading specialist. When mid-year

data reflected improvement on certain indicators, Student was returned to Tier I core instruction with continued monitoring. Later declines in selected benchmark measures prompted renewed Tier II intervention and eventual recognition of the need for more intensive Tier III support.

This progression demonstrates that the District did not remain passive in the face of fluctuating literacy performance. Rather, the District employed a data-driven, escalating intervention framework consistent with permissible use of MTSS under the IDEA, as in this case, where the Student continued to access the general education curriculum and demonstrate some academic growth. Additionally, this Student earned report card grades reflecting progress toward or achievement of expectations and continued to receive daily core instruction in reading, writing, and mathematics.

Although the Parents persuasively argued that earlier embedding of intensive specialized reading instruction in the IEP may have been educationally beneficial, the IDEA does not require districts to maximize student potential or to select a parent-preferred instructional methodology so long as the implemented programming is reasonably calculated to enable appropriate progress. *A.B. ex rel. D.B. Lawson,* 354 F.3d 315, 325 (4th Cir. 2004); *T.L. v. Lower Merion School District,* 2016 WL 34053; *Kathryn F. v. West Chester Area School District,* 2013 WL 6667773." *In re K.F., a student in the North Pocono School District*, ODR File No. 29032-23-24 p. 38 (HO Waters Fleming, 09/26/2024

With respect to speech-language services, the District provided ongoing therapy aligned with identified needs, adjusted goals based on progress, and incorporated SDIs targeting processing and attentional functioning. Student mastered a speech-language goal and demonstrated functional classroom participation. Although private providers recommended broader language-based intervention, the evidence does not compel the

conclusion that the District's level of service was inappropriate under IDEA's adequacy standard.

Similarly, the absence of SDIs specifically targeting written expression does not establish a FAPE denial, given that present levels reflect age-appropriate vocabulary, organized expression of ideas, participation in daily writing instruction, and overall progress toward expectations. The IDEA requires responsiveness to demonstrated need, not anticipatory programming for potential future deficits.

The team's determination that ESY services were not required during first grade is also supported by the record. Despite fluctuating literacy performance, the evidence did not establish significant regression following instructional breaks or an inability to recoup skills within a reasonable period. The Student continued to access grade-level content and demonstrate progress in multiple domains, including mathematics. The record supports the conclusion that Student derived meaningful educational benefit during first grade. Based on the totality of this record, the Parents have failed to establish a FAPE denial for the 2023–2024 school year.

By contrast, the 2024–2025 school year presents a materially different evidentiary landscape. At the Parent's request, the District conducted a comprehensive reevaluation in October 2024. The reevaluation included cognitive and academic testing, behavioral rating scales, extensive speech-language assessments administered over several hours, classroom observation, review of prior data, and input from both parents and teachers. Testing was conducted by credentialed professionals using valid and reliable instruments administered in accordance with standard procedures. This evaluation marked the first time the District identified a specific learning disability in reading and associated needs in fluency, comprehension, and

spelling. The RR also confirmed ongoing executive functioning and expressive language deficits.

Although the Parents argue that the reevaluation was inadequate, they have not met their burden on this assertion. The record demonstrates that the District acted within a reasonable timeframe, given evolving performance data, and did not fail to evaluate once a clearer pattern of disability-related academic difficulty emerged. IDEA requires comprehensive identification of needs, not detailed program design within the evaluation report itself. Although the RR sought to effectively inform the expanded November 2024 IEP, aspects of the resultant programming were inadequate.

The post-evaluation November 2024 IEP increased services to include daily research-based literacy instruction using the Wilson Reading System, additional special education reading and spelling support, expanded speech-language therapy, measurable goals, accommodations, and systematic progress monitoring. Student demonstrated measurable gains in foundational literacy skills and improvement on several benchmark measures during second grade, although performance remained below grade level and continued to reflect difficulty generalizing emerging literacy skills to connected text and grade-level academic tasks.

Nevertheless, this record supports Parents' contention that the program was not fully sufficient in scope and intensity to address the breadth of Student's disability needs. Credited testimony established that Student required broader SDIs to generalize literacy skills across academic contexts and that certain significant needs, including reading comprehension strategies and executive functioning, were only partially reflected in the IEP goal framework. Although the IDEA does not require that an IEP contain a separate goal for every identified need, the record established that the Student's executive functioning and reading comprehension deficits

significantly affected the ability to generalize developing literacy skills and access grade-level content. Under these circumstances, the absence of sufficiently targeted goals or clearly articulated specially designed instruction addressing these needs contributed to the program's lack of full responsiveness. Additionally, implementation was inadequate, as several specialized reading sessions were cancelled and not consistently made up. Access-related supports in writing and mathematics were not comprehensively developed during portions of the school year.

Despite these deficiencies, the totality of the evidence does not support a finding that Student failed to derive any meaningful educational benefit. Student met multiple literacy goals, demonstrated steady growth in decoding and encoding skills, and improved benchmark scores over time. The District convened multiple IEP meetings, revised programming in response to new data and parental input and ultimately offered ESY services, which the Parents declined.

The Parents have established, by a preponderance of the evidence, that a limited denial of FAPE occurred during portions of the 2024–2025 school year, attributable primarily to insufficient intensity and breadth of literacy-related and executive functioning SDIs and to substantively insufficient implementation of specialized instruction. Although the implemented programming was not fully responsive to all identified needs, it remained reasonably calculated to enable progress in light of Student's circumstances in core foundational literacy skills.

The same deficiencies also support a finding of a limited denial of FAPE under Section 504 of the Rehabilitation Act. Section 504 requires that a student with a disability receive regular or special education and related aids and services designed to meet her individual educational needs as adequately as the needs of nondisabled students are met. Here, the

insufficient intensity of literacy intervention and gaps in implementation and access materially affected Student's ability to benefit from instruction and participate fully in the educational program during portions of the 2024–2025 school year. Accordingly, the Parents have established a limited denial of FAPE under Section 504 for that period.

To the extent the Parents assert claims arising under the Americans with Disabilities Act (ADA), those claims are outside the jurisdiction of this special education due process proceeding. Therefore, no findings or relief are awarded under the ADA.

At the outset of the 2025–2026 school year, Student, now in third grade, demonstrated some regression in foundational reading skills. Following receipt of a September 2025 private psychoeducational evaluation recommending substantially increased literacy intervention, the District convened an IEP meeting, increased direct reading instruction, added access supports, and initiated a comprehensive reevaluation that included a functional behavioral assessment.

The November 2025 IEP intensified the Student's programming. It provided daily literacy intervention consisting of forty-five minutes of intensive phonics instruction and an additional thirty minutes of direct reading instruction, along with supplemental learning support, updated reading and speech-language goals with extensive therapy, numerous SDI to address literacy and executive functioning needs, accommodations, and eligibility for extended school-year services based on documented regression. On this record, the November IEP was reasonably crafted to enable appropriate progress.

Because the hearing concluded in January 2026, the evidentiary record regarding the remainder of the school year is incomplete. Accordingly, this

determination is limited to the program and student performance documented through the close of the hearing. The District's reevaluation conclusions and any subsequent IEP revisions were not yet implemented or available for review.

The Parents note that specialized reading sessions were missed, resulting in approximately 285 minutes of owed instruction as of December 2025. Insufficient implementation may constitute a denial of FAPE where it is material and results in a loss of educational benefit. Here, the missed Wilson instruction represented a limited portion of the overall daily specialized literacy programming provided across the school year. The evidence demonstrates that the District continued to provide daily intensive literacy instruction, offered make-up opportunities by extending sessions, and maintained systematic progress reporting. The missed minutes, while not insignificant, did not rise to the level of a systemic failure of implementation or deprive Student of a meaningful educational benefit.  The District issued its reevaluation report in January 2026 and was actively preparing to convene an IEP meeting at the time of hearing. This prospective planning further supports the conclusion that the District remained responsive to Student's needs.

Considering the totality of the evidence, including prompt response to regression, increased instructional intensity, continued related services, and provision of ESY eligibility, the record does not establish a denial of FAPE for the 2025–2026 school year to the date the hearing record closed. However, the missed specialized reading sessions warrant a limited equitable remedy.

**Compensatory Education**

An IDEA hearing officer has broad equitable powers to issue appropriate remedies when a local education agency violates the Act. All

relief under IDEA is equitable. *Forest Grove School District v. TA*, 557 U.S. 230, 129 S. Ct. 2484, 52 IDELR 151 (at n. 11) (2009); *Ferren C. v. Sch. Dist. of Philadelphia*, 612 F. 3d 712, 54 IDELR 274 (3d Cir. 2010); *CH by Hayes v. Cape Henlopen Sch. Dist.*, 606 F. 3d 59, 54 IDELR 212 (3d Cir 2010); *Sch. Dist. of Philadelphia v. Williams ex rel. LH*, 66 IDELR 214 (E.D. Penna. 2015); *Stapleton v. Penns Valley Area Sch. Dist.*, 71 IDELR 87 (E.D. Penna. 2017). *See Reid ex rel. Reid v. District of Columbia*, 401 F. 3d 516, 43 IDELR 32 (D.C. Cir. 2005); *Garcia v. Board of Ed., Albuquerque Public Schools*, 530 F. 3d 1116, 49 IDELR 241 (10th Cir. 2008); *In re Student with a Disability*, 52 IDELR 239 (SEA W.V. 2009).

Compensatory education is a remedy that is often awarded to parents when a local education agency violates the special education laws.  In Pennsylvania,  courts and hearing officers have frequently utilized the quantitative or "cookie cutter" method that utilizes one hour or one day of compensatory education for each day of denial of a free and appropriate public education. The "cookie cutter" or quantitative method has been approved by the courts, especially where there is an individualized analysis of the denial of FAPE or harm to the particular child. *See, Jana K. by Kim K. v. Annville Sch. Dist.*, 39 F. Supp. 3d 584, 53 IDELR 278 (M.D. Penna. 2014)

To remedy the FAPE denial during the 2024-2025 school year, the Student is entitled to compensatory education. Although the Student made measurable progress in some areas, the programming deficiencies resulted in a loss of educational opportunity in literacy generalization, independent academic functioning, and access to grade-level content. An award of fifty (50) hours of targeted compensatory literacy instruction is therefore appropriate. The Student should also receive an additional twenty (20) hours of compensatory education to target executive functioning and academic

access skills, including organization, task initiation, and strategies to support access to grade-level content.

# **ORDER**

AND NOW, upon consideration of the entire evidentiary record, it is hereby ORDERED as follows:

1. The Parents have met their burden of proving that the District denied Student a FAPE in a limited respect under both the IDEA and Section 504 during portions of the 2024–2025 school year.

2. As an equitable remedy for the limited denial of a FAPE during the 2024–2025 school year, the District shall provide Student with fifty (50) hours of compensatory education consisting of evidence-based literacy instruction addressing decoding, encoding, reading fluency, and reading comprehension. These services shall be provided by appropriately trained personnel and shall occur outside Student's regular instructional schedule unless the parties mutually agree otherwise. The services shall be available for use within two (2) years of the date of this Order.

3. The District shall also provide twenty (20) hours of compensatory education targeting executive functioning and academic access skills, including organization, task initiation, and strategies to support access to grade-level content.

4. The compensatory education awarded herein fully remedies the limited denial of FAPE established under both the IDEA and Section 504. No additional or duplicative relief is awarded under Section 504.

5. The Parents have not met their burden of proving that the District denied Student a FAPE under the IDEA or Section 504 during the 2025–2026 school year. However, the District shall provide compensatory specialized reading instruction equal to the net amount of Wilson Reading System instructional time not delivered, as documented in the record.

6. To the extent the Parents assert claims arising under the Americans with Disabilities Act (ADA), such claims are outside the jurisdiction of this due process proceeding and are therefore dismissed without findings.

It is **FURTHER ORDERED** that any claims not specifically addressed by this decision and order are DENIED. Jurisdiction is relinquished.

*Joy Waters Fleming, Esq.*
Joy Waters Fleming, Esq.
Special Education Hearing Officer

March 25, 2026

JS 44 (Rev. 04/21) **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Melissa W. and Brian W., individually and on behalf of A.W.

### DEFENDANTS
Methacton School District

**(b)** County of Residence of First Listed Plaintiff  Montgomery
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Montgomery
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Lindsay Burrill-VanDellen; Berney & Sang; 1628 JFK Blvd, Suite 1000, Philadelphia PA 19103; (616)914-0827

Attorneys *(If Known)*
Mark Burgmann, Esq

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### CIVIL RIGHTS
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [x] 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty
**Other:**
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

### IMMIGRATION
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### INTELLECTUAL PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*
- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
IDEA, Section 504, ADA

Brief description of cause:
Plaintiffs allege that Defendant denied their child an appropriate education. Plaintiffs seek, among other things, compensatory education.

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ 

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____  DOCKET NUMBER _____

DATE  6/15/2026

SIGNATURE OF ATTORNEY OF RECORD  *Lindsay Burrill-VanDellen*

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)    Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)    County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)    Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.    Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.    Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.    Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.    Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.    Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction: Eagleville Elementary School - Methacton School District - 125 Summit Ave, Eaglevilla PA 19403
Montgomery County

---

***RELATED CASE IF ANY:*** Case Number:_____ Judge:_____

1.  Does this case involve property included in an earlier numbered suit?                                                        Yes ☐

2.  Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit?          Yes ☐

3.  Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit?   Yes ☐

4.  Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual?   Yes ☐

5.  Is this case related to an earlier numbered suit even though none of the above categories apply?   Yes ☐
    If yes, attach an explanation.

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☑ **is not** related to any pending or previously terminated action in this court.

---

**Civil Litigation Categories**

*A.  Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts)
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Wage and Hour Class Action/Collective Action
☐ 6. Patent
☐ 7. Copyright/Trademark
☐ 8. Employment
☐ 9. Labor-Management Relations
☑ 10. Civil Rights
☐ 11. Habeas Corpus
☐ 12. Securities Cases
☐ 13. Social Security Review Cases
☐ 14. Qui Tam Cases
☐ 15. Cases Seeking Systemic Relief  ***see certification below***
☐ 16. All Other Federal Question Cases. *(Please specify)*:_____

*B.  Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify)*:_____
☐ 7. Products Liability
☐ 8. All Other Diversity Cases:  *(Please specify)*_____
   _____

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☑ **does not** have implications beyond the parties before the court and ☐ **does** / ☑ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

---

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

☑  Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐  None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.